UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MAJOR CHAPMAN, JR.,

                    Plaintiff,           Civil Action No.: 12-cv-12114
                                               Honorable Bernard A. Friedman
          v.                   Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [16, 18]

      Plaintiff Major Chapman brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  Both parties have filed summary judgment motions which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.**      **RECOMMENDATION**

      For the reasons set forth below, the Court finds that the ALJ did not err in his decision and his findings are supported by substantial evidence in the record.  Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Chapman's motion [16] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.     **Procedural History**

On March 19, 2010, Chapman filed applications for DIB and SSI, alleging disability as of January 1, 2006.  (Tr. 130-35).  The claims were denied initially on June 26, 2010.  (Tr. 74-76). Thereafter, Chapman filed a timely request for an administrative hearing, which was held on June 22, 2011, before ALJ Michael Dunn.  (Tr. 26-73).  Chapman, represented by attorney Samantha Bell, testified, as did vocational expert ("VE") Harry Cynowa.  (*Id.*).  On September 9, 2011, the ALJ found Chapman not disabled.  (Tr. 10-25).  On February 2, 2012, the Appeals Council denied review.  (Tr. 3-7).  Chapman filed for judicial review of the final decision on May 9, 2012.  [1].

B.     **Background**

1.     *Disability Reports*

In a disability field office report dated March 22, 2010, the administration representative noted no limitations during Chapman's interview, and noted that Chapman was "dressed for the weather, [ ] appeared to be in a good mood, [and had] no other degree of limitations."  (Tr. 154). In an undated adult disability report, Chapman stated that the condition preventing him from working was "mental issues."  (Tr. 157).  He reported being fired from his job for "other reasons," and not having received any treatment for, or examination of, his conditions.  (Tr. 158, 161).

In a May 3, 2010 function report, Chapman reported that his condition affected his ability to work in that he was unable to focus or concentrate and was unable to "stop the negative thoughts like something really bad is going to occur or that it already has."  (Tr. 163).  He reported not trusting others and always wanting to be alone, and that he was uncomfortable

around people. (*Id.*). Chapman reported that his condition affected his ability to sleep, but that it did not interfere with his personal care. (Tr. 164). Chapman reported being able to cook frozen meals and make sandwiches for himself, although he rarely has an appetite. (Tr. 165). He also reported being able to do household chores, but only for very short timespans and not daily. (*Id.*). However, he reported that he "keeps [his] personal living space neat to a fault." (Tr. 166). He reported being able to go out by himself, shop occasionally for food, and pay his bills. (*Id.*). His hobbies include reading, writing, crosswords and HAM radio operation, though he reported no longer engaging in these activities due to lack of interest. (Tr. 167). He reported talking to his mother and sisters "at least daily" and sometimes visiting them. (*Id.*).

Chapman reported that his condition interfered with his ability to talk, hear, remember, complete tasks, concentrate, understand, follow instructions and get along with others. (Tr. 168). He reported that when he is "bombarded by negative thoughts or feelings" he cannot focus and needs to be by himself. (*Id.*). His ability to follow written instructions depends on his "mindset and amount of time" he has, and he is not able to follow spoken instructions "to[o] well." (*Id.*). He finds that he does not get along well with authority figures because "they often lack patience and understanding," and that he needs time to adjust to changes. (Tr. 169). Chapman reported being fired from his last job because of his inability to get along with others. (*Id.*). Chapman remarked that he believed his thoughts arise from his small stature and advanced age, as well as an incident in his past where he killed someone defending himself. (Tr. 170). He "can't stop thoughts of something ugly or awful happening," and says that his "only defense for that is deep, deep prayer and to keep telling [himself] no, no, no, many times, over and over again…" (*Id.*) He was not taking any medications at the time he completed the report. (*Id.*). He reported using the MisterMajorJr@hotmail.com e-mail address. (*Id.*).

3

Chapman's mother filed a third-party function report on May 5, 2010. (Tr. 171-78). She reported that Chapman visits her two to three times a week and they watch television and talk. (Tr. 171). She reported that he does not participate in family gatherings and keeps to himself. (Tr. 172). She reported his clothes are soiled and smelly, he does not bathe or shave often enough and he does not care for his hair other than to wear a scarf over it. (*Id.*). She reported that he makes himself frozen dinners and cereal daily, and that he needs encouragement to perform household chores. (Tr. 173). She provided conflicting information about Chapman's shopping, indicating both that he shops for food and that "his sisters shop for him." (Tr. 174). She reported that he can pay his own bills and handle a checking and savings account. (*Id.*). His mother was not sure how often he engaged in his hobbies, although she noted that he does not seem to read as much or talk as much about his HAM radio. (Tr. 175). She indicated that he does not need somebody to accompany him when he goes places. (*Id.*). She reported that his conditions interfere with his ability to complete tasks, concentrate and get along with others. (Tr. 176). He starts projects and conversations without completing them. (*Id.*). His attention span is short and spoken instruction need to be repeated for him. (*Id.*). She reported that he does not handle stress well, does not like change and tends to be suspicious of people. (Tr. 177). In an undated disability appeals report, Chapman reported no change in his condition and indicated that he had undergone no tests nor taken any medication for his condition. (Tr. 181-83).

2.      *Plaintiff's Testimony*

At the hearing, Chapman testified that he had lost his previous job after having one of his "episodes." (Tr. 37). He had asked his supervisor if he could go to the restroom to "talk [him]self down" and had been denied. (Tr. 37-38). An argument ensued and he lost his job. (*Id.*). He testified that he is so embarrassed about his condition that he had never told anyone

4

before the date he filed his disability application.  (Tr. 38).  He testified that he works through his episodes by leaving the situation and calming himself down, telling himself that he will be "okay."  (*Id.*).  When he is unable to leave, he gets angry and "blow[s] up."  (*Id.*).  Chapman testified that when he was younger he killed a man who had allegedly attacked him and his girlfriend, though Chapman testified that he served a prison sentence as a result.  (Tr. 55).  He does not like going places due to possibly running into family members of the attacker or others who knew about the incident.  (*Id.*).  He testified that his condition also causes him anxiety around people generally and that he was unable to attend a family gathering as a result, remaining in the car during the event.  (Tr. 46).  Chapman testified that he only gets about 2-3 hours of sleep at a time and that he is constantly checking whether he locked his doors and enabled his security system.  (Tr. 54; 57).  If he is awake he will usually go out at night when no one is around.  (Tr. 55-56).  He testified that he has not received any treatment or taken any medication for his mental condition.  (Tr. 48).

Chapman testified that he is 5'10" and weighs 130 pounds.  (Tr. 39).  He had lost 15 pounds in the last year for unknown reasons.  (*Id.*).  He also testified he was diagnosed as diabetic.  (*Id.*).  Chapman testified that he suffers from headaches on his left side which sometimes last as long as 42 days.  (Tr. 40, 54).  A neurologist diagnosed him with cluster headaches.  (Tr. 40-41).  He has been prescribed Verapamil and oxygen for the headaches, but the medicine does not work and he has been unable to get the oxygen due to lack of insurance.  (Tr. 41).  He gets cluster headaches once or twice a year.  (Tr. 42).  About four or five times a week he has different headaches that involve his whole head, and he usually treats them with rest.  (Tr. 42-43).

Chapman testified that he also suffers from pain in his left shoulder that radiates to his

arm and fingers.  He suffered a motorcycle accident at age 19 and he believes that his pain is a result of damage done to his left shoulder at that time.  (Tr. 43).  Doctors tried prescribing him Lyrica for the pain, but he did not like the way it made him feel so he stopped taking it.  (Tr. 44). Chapman testified that he also suffers from anemia which contributes to a general lack of energy. (Tr. 44).

### 3.    Medical Evidence

### a.    Treating Sources

Chapman provided medical records from his primary physicians as well as from his neurologist, rheumatologist, and an emergency room visit.  (Tr. 189-98; 237-262; 292-308). These records only date from December 2007, and there are no records dating back to his alleged onset date of January 2006.  (*Id.*).

### 1.    Professional Medical Center

Chapman was treated by his primary physician at the Professional Medical Center on December 14, 2007, where his chief complaint was a follow-up to abdominal pain that appeared to be linked to lactose intolerance.  (Tr. 189).  He did not see his doctor again until September 16, 2009, where his chief complaint was the need for a physical exam and for a "form" to be filled out.  (Tr. 190).  Upon examination it was noted that Chapman had a full range of motion in his back and he moved all four extremities "spontaneously."  (*Id.*).  He was also assessed with impaired glucose tolerance.  (*Id.*).  Chapman was seen again on September 23, 2009, where he reported feeling well.  (*Id.*).  He was assessed with impaired glucose tolerance and to rule out anemia.  (*Id.*).  At a follow-up on November 3, 2009, Chapman was diagnosed as pre-diabetic, although he denied urinary urgency or frequency, and exhibited no polyuria or increased thirst. (Tr. 191).  He was advised to eat several small meals a day and start a walking program.  (*Id.*).

Chapman returned to his doctor in June 2010 for a "regular checkup." (Tr. 192). He complained of occasional leg swelling, although upon examination there was no edema or calf tenderness. (*Id.*). He was prescribed support stockings for varicose veins. (*Id.*).

### 2.   *Dr. Basil Qandil*

On October 19, 2010, Chapman was treated by Dr. Basil Qandil for a headache, sinus pressure and blood in his mucus. (Tr. 303). He complained of having sinusitis for a week, and also of left shoulder pain and fatigue. (*Id.*). Upon examination the doctor noted left shoulder tenderness. (*Id.*). The doctor assessed allergic rhinitis, acute sinusitis, headache, left shoulder pain and several other illegible items. (*Id.*). He also prescribed several illegible medications, including what appears to be Naproxyn. (*Id.*).

At a follow-up on October 26, 2010, Chapman's primary complaint is illegible, however he stated he had no new complaints. (Tr. 301). He was assessed with Vitamin D deficiency, anemia, left shoulder joint and muscular pain, asthma, and two or three other illegible assessments. (*Id.*). He was prescribed metformin and several other medications. (*Id.*). At a November 23, 2010 follow-up, Chapman complained of headaches and neck and left shoulder pain. (Tr. 300). Most of the doctor's notes are illegible, although it appears Chapman was diagnosed with migraine headaches and shoulder pain, as well as several other assessments. (*Id.*). Chapman returned on November 24, 2010, complaining of a bad left-side headache, as well as neck and ear pain radiating to his left cheek and temporal region. (Tr. 299). He was given an injection of Toradol with minimal results. (*Id.*). He had been given Soma the day before as well as Midrin, neither of which alleviated his migraine. (*Id.*). He ultimately was taken by ambulance to the emergency room.[1] (*Id.*). At a follow-up appointment on November

---

[1] Records submitted from his emergency room visit showed that Chapman's headache was

29, 2010, Chapman stated that the Midrin had not helped his headache, and the doctor referred him to the neurology clinic. (Tr. 298).

At a January 15, 2011 appointment, Chapman had no new complaints. (Tr. 297). At an appointment on February 23, 2011, Chapman complained of left shoulder and neck pain and asked for a referral. (Tr. 296). A cervical spine x-ray was ordered. (*Id.*). At an April 15, 2011 appointment Chapman complained of lower quadrant pain and requested a colonoscopy referral. (Tr. 295). At an April 17, 2011 appointment Chapman requested some tuberculosis test results. (Tr. 294). At a May 9, 2011 appointment Chapman again requested a colonoscopy referral. (Tr. 293). He was prescribed Tylenol 3. (*Id.*).

### 3.     *Harper Neurology Clinic*

Chapman saw Dr. Randall Benson in the Neurology clinic beginning on January 6, 2011. (Tr. 238). Chapman told Dr. Benson that he had been experiencing headaches on the left side of his head that came in clusters. (Tr. 238). He said the pain was excruciating and that he sometimes contemplated suicide because of it. (*Id.*). He indicated that the headaches last 3-4 weeks and that he had been to the emergency room several times as a result. (*Id.*). On his last trip to the emergency room the doctors had given him a "cocktail" of drugs that did not help, and he ultimately left so that he could be alone. (*Id.*). Dr. Benson's impression was that Chapman suffered from cluster headaches dating back to 1986 and that his previous shoulder injury and the subsequent pain could be exacerbating his headaches. (Tr. 240). Dr. Benson ordered an MRI to rule out a more serious condition. (*Id.*). The MRI, obtained on January 17, 2011, was normal. (Tr. 241). On February 24, 2011, Chapman informed Dr. Benson that he had not experienced a cluster since last seeing him. (Tr. 243). Dr. Benson prescribed supplemental oxygen and

---

treated with a combination of Compazine, Benadryl and Toradol, and he told the doctors his headache was "better at this point," and they discharged him. (Tr. 249).

Verapamil for Chapman to take as a prophylactic and recommended a follow-up in three months. (*Id.*).

At a follow-up on May 24, 2011, Chapman reported doing "fairly well" and being out of his cluster, although having "milder headaches." (Tr. 245). He reported taking Tylenol and Motrin 800 for these headaches. (*Id.*). He had not had a cluster for four months. (*Id.*). Dr. Benson again prescribed oxygen, as well as Topamax as a prophylactic. (Tr. 245-46).

### 4.    *University Physician Group*

Chapman visited Dr. Vijay Karia, a rheumatologist, on February 16, 2011, for his left shoulder pain. (Tr. 252). Chapman informed the doctor that his pain was aching and dull, and was aggravated by lifting and relieved by rest. (*Id.*). Associated symptoms were crepitus and decreased mobility. (*Id.*). Upon examination, Dr. Karia noted no abnormalities in Chapman's spine, and that he had a good range of motion in his neck. (Tr. 253). His range of motion was limited in his left shoulder and tender around his bicepital insertion. (*Id.*). Dr. Keria assessed osteoarthritis. He gave Chapman an injection of Kenalog and prescribed Tramadol for pain. (*Id.*). He referred Chapman to physical therapy. (*Id.*). There are no physical therapy records in the file, however.

On April 18, 2011, Chapman presented to Dr. Murray Ehrinpreis, for a colonoscopy evaluation, microcytic anemia and right shoulder joint osteoarthritis.[2] (Tr. 256). Upon examination, the doctor noted that there was no deformity, heat, or swelling in either of Chapman's hands, and that there was no motor weakness or sensory loss. (Tr. 258). He also noted that Chapman was not anxious and demonstrated appropriate mood and affect. (*Id.*). The doctor ordered a colonoscopy and recommended that Chapman follow up as needed regarding

---

[2] Although it is labeled as right shoulder in the notes, the Court assumes this was a mistake of the physician, as there are no records that Chapman suffers from any pain in his right shoulder.

his shoulder.

Chapman returned to Dr. Karia on April 21, 2011, for a follow-up.  (Tr. 260).  He informed the doctor that the Tramadol was not helping and that he was having fourth and fifth digit numbness.  (*Id.*).  Upon examination, Dr. Karia noted good range of motion in Chapman's neck and shoulders, albeit with some pain on his left shoulder.  (Tr. 261).  He gave Chapman another injection of Kenalog and started him on Lyrica for the neuropathy.  (Tr. 261-62).

### b.    *Consultative and Non-Examining Sources*

### 1.    *Mental*

On June 4, 2010, Chapman was assessed for his mental issues by Dr. Robert Fenton, a state agency psychologist.  (Tr. 199-204).  Chapman reported his overall health as "good" although he reported only sleeping 3-4 hours a night and eating maybe one meal a day.  (Tr. 200).  He reported that he does not work because he had never been able to get along with people.  (*Id.*).  He reported no friends, but that he gets along well with family members.  (*Id.*). Dr. Fenton noted that Chapman's attitude in the examination was "somewhat favorable and he was somewhat guarded throughout the evaluation."  (*Id.*).  He reported talking to his mother and sisters daily and that he is capable of cooking simple meals, cleaning his house and managing money.  (Tr. 201).  He uses public transportation, but does not have a valid driver's license. (*Id.*).

Dr. Fenton noted Chapman's overall mood as "neutral and somewhat sad."  (*Id.*).  He noted Chapman's outward affect as "restricted as evidenced by body language and poor eye contact."  (*Id.*).  Dr. Fenton noted that Chapman had contact with reality, minimal self-esteem and marginal motivation.  (*Id.*).  Chapman was able to recite the date, month and year, but could not state the day of the week or the season.  (*Id.*).  He was able to repeat four digits forward and

three backward and recall three of three objects after a three minute delay. (*Id.*). He was able to name the current president but unable to name any past presidents. (*Id.*). He was able to name three large cities. (*Id.*). He could perform only one serial 7 subtraction. (*Id.*). He was able to follow some directions but not others. (Tr. 202). His abstract thinking was intact. (*Id.*). Dr. Fenton diagnosed Chapman with post-traumatic stress disorder ("PTSD") and dysthymic disorder. (*Id.*). He issued Chapman a global assessment of functioning score of 50 and a guarded prognosis. (*Id.*). In his medical source statement, Dr. Fenton stated:

> Based on today's assessment this claimant is able to understand, retain, process, and carry out simple directions. He is not capable of responding appropriately to supervisors, co-workers, and the general public in a work related environment as he presents with anti-social personality traits as well as paranoia. He appears to be vulnerable and in a position subject to decline. I suspect that the pressures of employment would be a cause that could result in his failure to progress toward mood stabilization.

(Tr. 203).

On June 26, 2010, Dr. Ken Lovko reviewed Chapman's records and completed a psychiatric review technique ("PRT") form and residual functional capacity ("RFC") assessment for him. (Tr. 205-236). Dr. Lovko found that there was insufficient evidence of a medically determinable mental impairment through December 31, 2009, the date Chapman was last insured for benefits, as there was no evidence in the file prior to that date. (Tr. 205; 217). Dr. Lovko completed another PRT form, continuing to June 26, 2010 (the date of the form), finding that Chapman suffered from an affective disorder, specifically dysthymia, and an anxiety-related disorder, specifically PTSD. (Tr. 217; 222; 224). He concluded that Chapman was mildly limited in his activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence and pace, ("CPP") and had no episodes of decompensation. (Tr. 229). Dr. Lovko then found that Chapman was moderately limited in

11

his ability to understand, remember and carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 233-34).  Dr. Lovko stated that Chapman "can cooperate and tolerate the casual interactions necessary to perform tasks" and that his symptoms "may result in some impediment to work situations which involve large numbers of people; but it does appear that [claimant] would be able to handle settings where there are fewer other persons in the work setting."  (Tr. 235).  Dr. Lovko went on to state that Chapman "can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors."  (*Id.*).  Dr. Lovko gave little weight to examining psychologist Dr. Fenton's medical source statement finding that it was "a one[-]time snapshot assessment of [Chapman].  In addition, while examiner cites antisocial traits and paranoia as being impediments to functioning, he gives no diagnosis incorporating these issues." (Tr. 231).

## 2.   *Physical*

On July 23, 2011, Chapman was evaluated for neurological issues by Dr. R. Qadir for the state agency.  (Tr. 263).  Chapman reported cluster headaches as well as other headaches that he suffers from five times a week.  (*Id.*).  He reported having been prescribed Verapamil for his cluster headaches, which did not help, then Topamax, which "helped but he said it also slows him down a little bit."  (*Id.*).  He reported pain and difficulty moving his left shoulder.  (*Id.*). Upon examination, Dr. Qadir noted "some cracking sounds" in Chapman's left shoulder.  (Tr. 263).  Dr. Qadir's impression was that Chapman should "avoid any extensive stressful situations

12

as well as loud noises" and should "refrain from lifting heavy objects from his left shoulder." (*Id.*).  He stated that Chapman "should also be seen by a psychiatrist, because of his depression and anxiety, which could be making his headaches worse."  (Tr. 265).  He found normal flexion in all of Chapman's extremities as well as his back.  (Tr. 266-67).  He found no deficiencies in Chapman's physical abilities as a result of his examination.  (Tr. 268).  Dr. Qadir issued an RFC assessment, finding Chapman capable of lifting and carrying up to 50 pounds frequently, and up to 100 pounds occasionally.  (Tr. 270).  He had no limitations in sitting, standing or walking, and could reach, handle, finger, feel, push and pull continuously with his right hand, and the same with his left, except that he could only reach and reach overhead only occasionally with his left hand.  (Tr. 272).  He issued no postural restrictions.  (Tr. 273).  He determined that Chapman could be exposed frequently to unprotected heights, moving parts, and could operate a motor vehicle.  (Tr. 274).  However, he could only occasionally be exposed to humidity, dust, odors or fumes, extreme heat or cold, vibrations, or loud noises.  (*Id.*).

On July 23, 2011, Chapman was also examined by Dr. Katherine Karo, for the state agency, for a physical medicine report.  (Tr. 277-90).  Chapman reported left shoulder and neck pain, and that x-rays had revealed osteoarthritis.  (Tr. 277).  He reported never having received physical therapy.  (*Id.*).  He reported being able to sit, stand and walk 60 minutes each.  (*Id.*).  Upon examination, Dr. Karo noted loss of range of motion in the cervical spine "secondary to complaint of neck pain and loss of range of motion of the left shoulder secondary to complaint of neck pain."  (Tr. 278).  She noted "tenderness to palpation of the cervical paraspinal muscles," but no significant muscle atrophy, and that his tone and strength were normal.  (Tr. 279).  She took an x-ray of the left shoulder which showed minimal degenerative osteoarthritic changes.  (Tr. 280).  An x-ray of the cervical spine showed "moderate degree degenerative osteoarthritic

changes of the cervical spine. Moderate degree of narrowing and sclerotic changes of the intervertebral disc space at C5-6, C6-7 and C7-T1 levels." (*Id.*). Dr. Karo noted specific limited range of motion in Chapman's cervical spine and left shoulder on a separate sheet, noting his complaints of pain. (Tr. 281). She found him capable of engaging in all abilities, although carrying, pushing or pulling occur with left side pain. (Tr. 283). Dr. Karo also completed an RFC assessment for Chapman, finding him capable of lifting and carrying up to 50 pounds frequently and up to 100 pounds occasionally. (Tr. 285). She found him capable of sitting, standing and walking 1 hour at a time for a total of 3, 3 and 2 hours respectively. (Tr. 286). She found no limitations in Chapman's ability to reach, handle, finger, feel, push or pull with either arm. (Tr. 287). She further found that he could frequently engage in all postural activities, and that he could frequently tolerate moving parts and operating a motor vehicle. (Tr. 288-89). He could only occasionally tolerate humidity, dust, odors or fumes, extreme heat or cold, vibrations or noise, and could never work around unprotected heights. (Tr. 289). Dr. Karo found that Chapman could engage in all activities of daily living, and that his limitations either had not lasted for 12 consecutive months or were not likely to last that long. (Tr. 290).

### 4.    *Vocational Expert's Testimony*

VE Harry Cynowa testified at the hearing that Chapman's past work as an assembler was light and unskilled and his work as a materials handler was medium and unskilled. (Tr. 61). The ALJ then posed the following hypothetical to VE Cynowa:

> Assume that we have a hypothetical worker who is capable of performing at the medium exertional level, lifting up to 50 pounds occasionally. Lifting or carrying up to 25 pounds frequently. And medium work as defined by the regulations. I want you to assume, however, that there should only be occasional reaching with the left upper extremity and that there should be no overhead reaching with the left upper extremity. Also I'm going to ask you to assume that because of impairments in concentration, persistence, or pace, the work must be limited to simple,

14

> routine, and repetitive tasks performed at SVP1 or 2 as defined in the
> Dictionary of Occupational Titles.  That the work must be free of fast-
> paced production requirements with an emphasis on a per shift rather than
> a per hour or otherwise timed basis.  Additionally, the work must involve
> only simple work-related decisions and there must be few, if any,
> workplace changes.  I'm going to also ask you to assume that there should
> be only occasional interaction with the general public and only occasional
> interaction with co-workers.

(Tr. 62-63).  The ALJ then asked the VE whether such a hypothetical claimant could perform

Chapman's past work.  (Tr. 63).  The VE answered in the negative, testifying that the reaching

limitations would preclude the past work.  (*Id.*).  The ALJ then asked whether there were other

jobs in the national economy that such a hypothetical claimant could perform.  (*Id.*).  The VE

testified that there were, including cleaner positions (10,000 positions in the regional market),

kitchen helper (3,000 positions) and dietary aide or food service worker (3,000) positions.  (Tr.

63-64).  The ALJ then changed the hypothetical to reduce the exertional limitation from medium

to light work (lifting up to 20 pounds occasionally and 10 pounds frequently), with standing and

walking up to six hours of an eight-hour day and sitting for two hours, with normal breaks.  (*Id.*).

The ALJ then asked if there were jobs in the national economy that such a claimant could

perform.  (*Id.*).  The VE again testified that there were, including hand packager (2,500 positions

in the regional market), small product assembler (2,500 positions) and visual inspector/checker

(1,000 positions).  (Tr. 64-65).

Chapman's counsel then asked the VE what the allowable number of rest breaks were for

the aforementioned positions.  (Tr. 68).  The VE testified that typically employers would allow

two 10-15 minute breaks a day along with a half hour to 45 minute lunch break.  (*Id.*).  Counsel

then asked about the number of permissible absences, and the VE testified that it is usually

limited to two a month.  (*Id.*).

15

### C.        Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if
> other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21

(E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of*

*Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout

the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is

not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.   The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Chapman was not disabled. (Tr. 10-24). At Step One, the ALJ determined that Chapman had not engaged in substantial gainful activity since his alleged onset date. (Tr. 15). At Step Two he found the following severe impairments: "degenerative disc disease of the cervical spine; degenerative joint disease left shoulder; cluster headaches, affective disorder; and anxiety disorder." (*Id.*). The ALJ found that Chapman's allegations of diabetes and neuropathy were not severe. (*Id.*). At Step Three the ALJ concluded that none of Chapman's impairments, either alone or in combination, met or medically equaled a listed impairment. (Tr. 15-16). In analyzing the evidence at this step, the ALJ found that Chapman had mild restrictions in his activities of daily living, moderate difficulties in social functioning, moderate difficulties in maintaining CPP, and no episodes of decompensation. (Tr. 16).

The ALJ then assessed Chapman's RFC, finding him capable of performing

> medium work . . . except he is limited to lifting up to 50 pounds occasionally and 25 pounds frequently. He is also limited to only occasional reaching with the left upper extremity; and no overhead reaching with the left upper extremity. He is further limited to performing simple, routine, and unskilled repetitive tasks with no fast-paced production requirements and an emphasis on production per shift versus a per hour or otherwise timed basis. In addition, the claimant is limited to making simple, work-related decisions and must work in an environment free of workplace changes and with only occasional interaction with the general public and co-workers.

(Tr. 17). The ALJ found that, based on this RFC assessment and VE testimony, Chapman would not be able to return to his past work as an assembler or a materials handler. (Tr. 19). The ALJ found, however, based on the RFC and VE testimony, that there were a significant number of

17

other jobs in the national economy that Chapman could perform, and thus he was not disabled under the Act.  (Tr. 20-21).

### E.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).

The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

## F.      Analysis

Chapman argues that the ALJ's decision was not supported by substantial evidence in that he erred when he found Chapman did not meet or medically equal a listed impairment, erred in not considering Chapman's severe impairments in the aggregate, and erred in his credibility determination. Chapman also argues that the ALJ erred in accepting the VE's testimony regarding available work, as it was contrary to the Dictionary of Occupational Titles ("DOT"). The Court will take each argument in turn.

### 1.      *Meeting or Medically Equaling a Listed Impairment*

Chapman argues that the ALJ erred in finding that he did not meet or medically equal a listed impairment, specifically Listing 12.04, Affective Disorders. In order to meet or medically equal this listing, a claimant must demonstrate marked limitations in two of three areas of functioning (activities of daily living, social functioning, or CPP), or marked restrictions in one

area coupled with repeated episodes of decompensation.  20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06, pt. B.  "Marked" means "more than moderate but less than extreme," and "the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.* at § 12.00, pt. C.

Chapman argues that the ALJ erred in finding that he suffered only moderate, rather than marked, difficulties in both social functioning and CPP.  In support of his argument, Chapman cites mainly his own reports and testimony, as well as the report of Dr. Fenton, to which the ALJ ultimately gave little weight.  None of that evidence supports reversing the ALJ's conclusion.

Regarding social functioning, the ALJ reasoned that Chapman only suffers moderate difficulties because he "visits and talks to his mother, and sometimes his sisters.  In addition, the claimant has interacted appropriately in all examinations of record, as well as at the hearing." (Tr. 16).  While taking note of Dr. Fenton's report, which found Chapman incapable of responding appropriately to supervisors, co-workers or the general public, the ALJ ultimately gave it little weight, "as it is a one-time snapshot assessment of the claimant and [I] find that while the examiner cites antisocial [sic] traits and paranoia as being impediments to functioning, he gives no diagnosis incorporating these issues."  (Tr. 19).  He instead gave significant weight to the non-examining consulting psychiatrist Dr. Lovko's opinion which criticized Dr. Fenton's report for these same reasons and which opined that Chapman has only moderate restrictions in social functioning.  (*Id.*).  The ALJ found Dr. Lovko's assessment consistent with the record as a whole.  (*Id.*).

Chapman argues that the ALJ's acceptance of Dr. Lovko's reviewing opinion over that of examining Dr. Fenton was error.  While the Court addresses the merits of that argument in this Recommendation's next section, its resolution would not answer the question at hand.  Even if

20

the ALJ had erred in giving more weight to non-examining Dr. Lovko than to Dr. Fenton, Dr. Fenton only assessed what could be considered a "marked" limitation in one area: social functioning, as evidenced by his finding that Chapman was "not capable of responding appropriately to supervisors, co-workers and the general public in a work related environment." (Tr. 203).  Dr. Fenton specifically found no such marked limitation in Chapman's ability to maintain CPP, noting that Chapman could "understand, retain, process, and carry out simple directions," capabilities which the ALJ incorporated in Chapman's RFC.  (*Cf.* Tr. 17 with Tr. 203).  Nor did Dr. Fenton make any mention of  Chapman's ability to adequately complete activities of daily living or state that he suffered from even one, let alone repeated episodes of decompensation.  (Tr. 203).  Thus, even if the ALJ had adopted Dr. Fenton's opinion and assessed a marked limitation in social functioning, it would not have been sufficient to result in Chapman meeting or medically equaling listing 12.04.  *See Robertson v. Comm'r of Soc. Sec.*, 2013 U.S. App. LEXIS 1763, *3 (6th Cir. Jan. 25, 2013) *quoting Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("[T]o be found disabled based upon a listed impairment, the claimant must exhibit all the elements of a listing . . . It is insufficient that a claimant comes close to meeting the requirements of a listed impairment.").

Chapman counters that the diagnoses of PTSD and dysthymia alone support a finding of a marked limitation in CPP, citing medical texts stating that poor concentration is a symptom of both disorders.  However, "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual." *Dukes v. Comm'r of Soc. Sec.*, No. 10-436, 2011 U.S. Dist. LEXIS 105526 at *16, 2011 WL 4374557 (W.D. Mich. Sept. 19, 2011) *quoting McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 U.S. App. LEXIS 11791, 2000 WL 687680 at *5 (6th Cir. May 19, 2000).  Furthermore,

21

the only doctor to render these diagnoses was Dr. Fenton, and he specifically did not find what could amount to a marked limitation in CPP. As there are no treating records in the file regarding Chapman's mental impairments, there is no evidence to support the argument that Chapman met or medically equaled listing 12.04 or any other listing.

2.    *Weighing Examining and Non-examining Physician Opinions*

Chapman argues that the ALJ erred in: (1) not considering his severe impairments in the aggregate; and (2) downplaying Chapman's mental impairments by accepting a non-examining psychiatrist's opinion over that of a one-time examining psychologist.

Generally, opinions of non-treating examining sources are afforded more weight than those of non-examining sources. However, contrary to Chapman's assertions, "it is not a *per se* error of law . . . for the ALJ to credit a nonexamining source over a nontreating source." *Norris v. Comm'r of Soc. Sec.*, 461 Fed. Appx. 433, 439 (6th Cir. 2012). As the Sixth Circuit noted in *Norris*, "[a]ny record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics or if it is inconsistent with the record." *Id.* Here, the ALJ gave little weight to Dr. Fenton's opinion, citing the criticism of Dr. Lovko, which found that the assessment was "a one time [sic] snapshot assessment of the [claimant]. In addition, while [Dr. Fenton] cites antisocial traits and paranoia as being impediments to functioning, he gives no diagnosis incorporating these issues." (Tr. 19; 231).

Chapman argues that the ALJ erred in discounting Dr. Fenton's opinion by not incorporating his assessments of antisocial behavior or paranoia into these diagnoses. Chapman argues that Dr. Fenton's diagnoses of PTSD and dysthymia, by their own symptomatology as reflected in cited medical literature, necessarily incorporate symptoms of antisocial behavior and paranoia, and thus it should be assumed that Dr. Fenton rendered those assessments as symptoms

of his diagnoses.  However, an ALJ is not a medical expert and is not entitled to act as one to create a logical leap among symptoms, a diagnosis, and functional limitations where a doctor has failed specifically to do so.  *See Shackelford v. Comm'r of Soc. Sec.*, No. 10-cv-604, 2011 U.S. Dist. LEXIS 105648 (S.D. Ohio Aug. 23, 2011) ("The ALJ is not a medical expert and may not go outside the record to medical textbooks for the purpose of making his own exploration and assessment as to claimant's physical condition.") (internal quotations omitted).  Further, contrary to Chapman's assertions, the ALJ did not act as a medical expert in rejecting Dr. Fenton's opinion for failure to assimilate antisocial behavior and paranoia into his diagnoses.  Instead, the ALJ accepted the opinion of another physician, Dr. Lovko, who criticized and rejected Dr. Fenton's reports for those same reasons.  (Tr. 231).  The ALJ specifically stated his reasons for accepting Dr. Lovko's opinion over that of Dr. Fenton, and the Court cannot say that the weight of the evidence compels a different result.

Second, Chapman argues that the ALJ erred in discounting Dr. Fenton's assessment because it was a single evaluation rather than a continuing treating relationship.  In support of his argument, Chapman cites *Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989), where the court noted that mental disorders "are not uncommonly diagnosed after one interview."  *Id.* at 1121. However, the claimant in *Blankenship* was diagnosed not once, but on multiple occasions with various stages of psychiatric disorders, which were corroborated by a CT scan.  *Id.*.  Here, there was only one exam by a single consulting psychologist, which resulted not only in diagnoses of PTSD and dysthymia, but also in broad statements of functional limitations therefrom.  Contrary to Chapman's arguments, the ALJ did not take issue with Dr. Fenton's diagnoses themselves, but with his extrapolation from a one-time assessment of current function to Chapman's ability to function on a longitudinal basis.  (Tr. 19).  The ALJ opined as much at the hearing, informing

Chapman on more than one occasion that he did not feel he could rely solely on Dr. Fenton's assessment, and encouraging Chapman to seek another opinion before the record was closed. (Tr. 50-51; 68-71). As the ALJ specifically discussed at the hearing and in his decision, the lack of any treatment records or other corroborative evidence of Chapman's mental limitations was what ultimately led him to reject Dr. Fenton's opinion. (Tr. 19). *See West v. Astrue*, 2011 U.S. Dist. LEXIS 20784, *28-29 ("The inconsistency of an opinion with the record as a whole is specifically enumerated in the regulations as a reason for determining that the opinion is entitled to reduced weight.") (*citing* 20 C.F.R. ¶ 404.1527(c)(4)). Based on a review of the record as a whole, the Court cannot say that the ALJ's conclusion is not supported by substantial evidence.[3]

Chapman argues that the ALJ erred in accepting the opinion of a non-examining reviewing physician over an examining one. While opinions of examining physicians are generally entitled to more weight than those of non-examining physicians, this is only true where the results of those examinations are consistent with the record as a whole. *Norris v. Comm'r of Soc. Sec.*, 461 Fed. Appx. 433, 439 (finding rule that opinions of examining sources generally accorded more weight than non-examining sources is not a *per se* one, opinion still must be consistent with the record as a whole). Here, the ALJ found that Dr. Fenton's opinion was not consistent with the rest of the evidence and that he did not adequately explain his findings. In

---

[3] The Court is mindful of the Sixth Circuit's words of caution, that an ALJ "must be careful not to assume that a patient's failure to receive mental health treatment evidences a tranquil mental state. For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572, F3d. 272, 283 (6th Cir. 2009). However, this is not one of those cases. Here, the ALJ evaluated the lack of treatment not in assessing Chapman's mental state itself, but in assessing the value of Dr. Fenton's one-time examining opinion. (Tr. 19). He further weighed that opinion against the available treating records, none of which discussed any problem with Chapman's ability to get along with others, let alone a debilitating inability to do so. (*Id.*). The ALJ also cited the fact that Chapman interacted well with his close family members and acted appropriately "at all examinations of record, as well as at the hearing." (Tr. 16). Again, in light of the foregoing, the Court cannot say that the ALJ's conclusion was not supported by substantial evidence.

doing so, the ALJ relied verbatim on the critique by Dr. Lovko.  As noted above, the ALJ was entitled to rely on that critique and entitled to weigh the evidence accordingly.  There is nothing in this record that leads the Court to conclude that the ALJ committed reversible error in his decision.

### 3.    Considering Chapman's Severe Impairments in the Aggregate

Chapman argues that the ALJ only assessed each of his impairments individually, not together, as required by 20 C.F.R. § 404.1523.[4]  Specifically, Chapman argues that his mental impairments could effectively exacerbate his physical impairments and vice versa, and that the ALJ failed to account for this in his analysis.  The Court disagrees.  While the ALJ did discuss each impairment individually, he also noted various physician's observations that some of Chapman's conditions could possibly affect others – specifically that one doctor recommended limiting Chapman's exposure to stressful situations and loud noises due to his headaches, and that he was urged to see a psychiatrist because his anxiety and depression could be making his headaches worse.  (Tr. 18).  The ALJ gave these opinions significant weight and the RFC assessment he rendered adequately reflects these concerns.  (Tr. 17-19).

### 4.    The ALJ's Credibility Determination

Chapman argues that the ALJ's opinion fails to adequately explain his credibility determination, and instead relies on boilerplate language to conclude that Chapman was not credible.

The Sixth Circuit has held that an ALJ is in the best position to observe a witness's

---

[4] 20 C.F.R. § 404.1523 states, in pertinent part, "In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."

demeanor and to make an appropriate evaluation as to her credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Thus an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). When a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, she must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record." to determine if the claimant's claims regarding the level of her pain are credible. *Soc. Sec. Rul.* 96-7, 1996 SSR LEXIS 4 at *3, 1996 WL 374186 (July 2, 1996); *see also* 20 C.F.R. § 404.1529.

Chapman focuses on one section of the ALJ's opinion, where the ALJ states that while "the medically determinable impairments could reasonably be expected to cause the alleged symptoms; [ ] the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 18). Had the ALJ's analysis stopped there, Chapman may have a valid argument. However, the ALJ did not stop there, and instead discussed Chapman's reports and testimony; indeed he dedicated seven full paragraphs to discussing the specific objective medical evidence that supported his RFC assessment and, intertwined with that, his credibility determination. (Tr. 18-19). Chapman's argument is without merit.

### 4.    *Available Work*

Finally, Chapman argues that the ALJ erred in accepting the VE's testimony about the type of work available to him. Specifically, Chapman asserts that "the ALJ failed to follow his duty to verify the VE's testimony under SSR 00-4p. This is particularly true where reaching

limitations are concerned, as the DOT does not distinguish between overhead and regular reaching…"   (Doc. #16 at 21).   Chapman concludes that had the ALJ verified the VE's testimony, he would have determined that, based on Chapman's RFC, he could not perform the work the VE cited as being available to him.  Chapman's argument fails for several reasons.

First, there is no inconsistency between the VE's testimony and the DOT regarding the exertional level or reaching requirements of the jobs he cited.  At the hearing, the VE testified that, based on Chapman's RFC, he could perform the positions of hospital cleaner, kitchen helper and dietary aid or food service worker, all at the medium exertion level.  (Tr. 63-64).  Chapman argues that the VE's testimony was erroneous because the lifting of 50 pounds frequently necessarily requires both arms and Chapman is limited in the amount he can lift with his left arm.  However, the ALJ did not assess an RFC that included frequent lifting of 50 pounds, only occasional lifting of that weight.  (Tr. 17; 62).  Further, he did not find a distinction between Chapman's right and left arm with regarding to lifting or carrying, only with regards to reaching and reaching overhead.  (Tr. 17).  Nor did any doctor issue restrictions limiting Chapman's ability to lift or carry with his left arm more than his right.  (Tr. 270; 285).[5]  Therefore the VE's testimony was not inconsistent with the RFC the ALJ posed in his hypothetical.  (Tr. 62-63).

Chapman also argues that positions the VE testified were available to him are all listed in the DOT as requiring frequent or constant reaching, while he is limited to only occasional reaching with his left arm.  However, as the Commissioner points out, none of the positions cited specify that the reaching required by them is bilateral in nature, nor does Chapman argue as

---

[5] In the "Impression" section of his report, Dr. Qadir did note that "[b]ecause of the headaches, [Chapman] should also refrain from lifting heavy objects from his left shoulder."  (Tr. 264).  However, he did not opine what constituted "heavy" and he did not issue RFC restrictions on lifting or carrying that distinguished between Chapman's right and left arms.

much.  Based on the ALJ's hypothetical, the VE was entitled to identify positions that would require more than occasional reaching so long as that reaching could be done with one arm only. The VE's testimony is consistent with the hypothetical posed by the ALJ.

Finally, Chapman argues that the position of dietary aide is not available to him because it is a semi-skilled position (SVP 3) and he is limited to only unskilled work (SVP 1 or SVP 2). He argues that the VE's testimony should be rejected in its entirety based on this inconsistency, and that the ALJ erred in accepting it without independently verifying the inconsistency.  That is not the law in this Circuit.

In the Sixth Circuit, an ALJ "is under no independent obligation to verify the accuracy of the VE's testimony beyond what is required under Ruling 00-4p, 2000 SSR LEXIS 8, which the ALJ did here.[6]  Nor is the ALJ bound by the DOT in making his final disability determination." *Baker v. Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 84284 at \*14 (E.D. Mich. June 18, 2012). As the Sixth Circuit stated in *Beinlich v. Comm'r of Soc. Sec.*, 345 Fed. Appx. 163 (6th Cir. 2009):

> Even if there were an inconsistency, the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision.  As an initial matter, neither the ALJ nor the VE is required to follow the DOT.  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding that "the ALJ and consulting vocational experts are not bound by the Dictionary in making disability determinations because the Social Security regulations do not obligate them to rely on the Dictionary's classifications").  The ALJ fully complied with SSR 00-4p, 2000 SSR LEXIS 8 when he asked the VE whether there was "any discrepancy between [her] opinions and the DOT standards for the requirements of the jobs [she] named."  *See Lindsley*, 560 F.3d at 606 (holding that the ALJ

---

[6] Ruling 00-4p provides, in pertinent part: "When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT."

> fulfilled his duties when he asked the VE whether there was any "discrepancy between your opinions and the DOT standards," even if the VE did not disclose a conflict.  As *Lindsley* makes clear, the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p, 2000 SSR LEXIS 8.  Id.  This obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT.  The fact that plaintiff's counsel did not do so is not grounds for relief. See *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir.2008).

*Id.* at 168-69.  Here, the ALJ specifically asked the VE whether his testimony was consistent with the DOT, and the VE responded that it was.  (Tr. 67-68).  The ALJ then offered Chapman's counsel the opportunity to cross-examine the VE, during which time he could have questioned the VE about any apparent conflicts between the two.  (Tr. 68).  However, counsel merely asked about scheduled breaks and allowable absences.  (*Id.*).  In sum, the ALJ performed his duty as required by the law of this Circuit and was not required to explain a possible inconsistency between the VE testimony and the DOT that was not made apparent to him at the hearing.  *See Martin v. Comm'r of Soc. Sec.*, 170 Fed. Appx. 369, 374 (6th Cir. 2006) (finding that where claimant failed to bring an apparent conflict between the DOT and vocational expert testimony to ALJ's attention, ALJ was not required to explain how the conflict was resolved).

For all of these reasons, the Court finds that the ALJ's opinion was correctly rendered and is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Chapman's Motion for Summary Judgment [16] be **DENIED**, the Commissioner's Motion [18] be **GRANTED** and this case be **AFFIRMED**.

Dated: June 17, 2013                          s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                                        United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 17, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

30